GEORGE C. SMITH, JUDGE
*881 This matter is before the Court upon the Motion of Defendant American Multi-Cinema, Inc. ("AMC") for Summary Judgment on Plaintiff's claims for violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA") and Ohio Revised Code § 4112.02. (Doc. 32). The motion is fully briefed and ripe for disposition. For the following reasons, AMC's Motion is GRANTED IN PART and DENIED IN PART .
I. FACTUAL BACKGROUND
A. Plaintiff's employment with AMC
Plaintiff Jared Hickle began employment with AMC in 2004, initially as part of the "film crew" staff, and then advanced to Operations Coordinator in 2006, to Hourly Manager in 2009, and to Kitchen Manager at AMC's Easton Theater in Columbus, Ohio in 2013. (Doc. 29-1, Hickle Dep. at 66, 91, 113, 116). Concurrently, in 2008, Plaintiff joined the Ohio Army National Guard and continued to serve in the military throughout the remainder of his employment with AMC. (Id. at 57, 61). Plaintiff's military service required him to take time off from his work with AMC, including a six-month period in 2008 for basic training and advanced individual training, a year-long deployment to Afghanistan in 2011-12, mandatory weekend training drills held once every month, and mandatory two-week training programs held every summer. (Id. at 43-44, 69-70, 73-74). In all instances, Plaintiff provided AMC with the dates of his military obligations well in advance and AMC granted Plaintiff all the time off he requested in connection with his military service. (Id. at 77, 80-81, 354).
In March 2008, a few months prior to leaving for basic training, Plaintiff applied for a promotion to an Hourly Manager position but was not selected. (Id. at 125-27). As noted above, AMC later promoted Plaintiff to Hourly Manager in 2009 after he returned from his initial military training. (Id. at 113). Plaintiff's promotion to Kitchen Manager in 2013 followed his return to AMC after his year-long deployment to Afghanistan. (Id. at 116-17, 148-49).
While Plaintiff's performance evaluations (completed by AMC Easton General Manager Tim Kalman) were largely positive, several of his written reviews noted that he sometimes spoke to employees under his supervision in an unprofessional manner and he was encouraged to work on his communication skills. (Doc. 32-1, Performance Evaluations, PAGEID # 705, 707, 709, 712, 715). Multiple employees also filed complaints with AMC about the way Plaintiff treated them, complaining that Plaintiff was "being unfair and abusing his power," speaking to employees in a belittling and aggressive manner, and making an example of employees in a demeaning way while others were present. (Doc. 32-3, Employee Complaints, PAGEID # 759-67).
B. Remarks regarding Plaintiff's military obligations
Although Plaintiff received all requested time off for his military obligations, on more than one occasion, AMC employees made negative comments regarding the amount of time off Plaintiff required. After Plaintiff was passed over for promotion in 2008 prior to leaving for basic training, the employee who was selected for the promotion allegedly stated to Plaintiff, *882 "Thanks for joining the military. I just got promoted." (Doc. 29-1, Hickle Dep. at 384).
Plaintiff's immediate supervisor, Jacqueline Adler, also made a number of comments that Plaintiff interpreted as discriminatory on the basis of his military service. According to Plaintiff:
• Adler would often tell him that his requesting time off for his military service was frustrating to her. (Id. at 338).
• Adler once told Plaintiff that he should be moved from the kitchen to the front of house, because there were more managers available there and Plaintiff's military service would not cause such a scheduling headache for her. (Id. at 339).
• When Plaintiff informed Adler in June 2014 that he could not work the closing shift the night before his weekend military drills, Adler told him that he would have to find another job, because he no longer met the minimum qualifications for being an AMC employee. (Id. at 340).
• In February 2015, Adler stated in reference to Plaintiff requesting time off for military service in each of June, July, and August of that year, "So you're taking off the whole summer. We just need to get you replaced." (Id. at 341).
• In early April 2015, Plaintiff reminded Adler that he would not be able to work the weekend of "The Avengers" movie release due to a mandatory military drill. Adler responded that Plaintiff would be terminated if he failed to report for work that weekend and that the reason for requesting the weekend off "doesn't matter." Plaintiff then told Adler that it was unlawful for her to terminate his employment because of his military service, to which Adler responded, "Well, that's okay. We will find something else to terminate you on." (Id. at 328).
Adler denies making any of these statements.
C. Plaintiff's April 17, 2015 altercations with kitchen employees
On Friday, April 17, 2015, Plaintiff was managing the employees and operations at AMC's Easton Theater. (Doc. 33-3, April 17, 2015 Statement of Jared Hickle). Plaintiff found a to-go box in the kitchen microwave containing ten chicken tenders, and, after Plaintiff queried the room, kitchen employee Quinton Branham admitted that they belonged to him. (Id. ). Because the to-go box contained ten chicken tenders, which exceeded the limit of five that employees were permitted to take home with them, Plaintiff was concerned that Branham had engaged in theft. (Id. ). Plaintiff and Branham engaged in a heated back-and-forth involving profanity. (Doc. 29-1, Hickle Dep. at 235-36; Doc. 32-2, April 18, 2015 Statement of Quinton Branham, PAGEID # 733-36). Additionally, according to Branham, Plaintiff made racially-charged remarks analogizing Branham's possession of the extra chicken tenders to possession of drugs, and stating that "possession is nine-tenths of the law." (Doc. 32-2, April 18, 2015 Branham Statement, PAGEID # 733-34).
Plaintiff then decided that none of the kitchen staff would be permitted to take food home with them that night, and he instructed all of the kitchen staff to take a break to eat any food they had been planning on taking home with them. (Doc. 33-3, April 17, 2015 Hickle Statement). Another kitchen employee, Dwight Williams, took issue with Plaintiff's decision, and Plaintiff and Williams also engaged in a heated discussion involving raised voices *883 and profanity. (Id. ; Doc. 32-2, April 20, 2015 Statement of Tim Kalman, PAGEID # 740).
AMC suspended Branham and Williams and ultimately terminated their employment for their part in the dispute. (Doc. 36, Dep. of Tim Kalman at 36.).
D. Plaintiff's fear of a plot to have him fired
On Sunday, April 19, 2015, two days after the altercations with Branham and Williams, Plaintiff texted Adler to seek her guidance regarding what he termed a "major issue." (Doc. 33-8, April 19 2015 Text Messages). Plaintiff told Adler that he had learned that "several supervisors and managers are plotting against me" and that three different AMC employees had told him that "[y]ou [Adler] told them there wasn't much you could do because 'I am Tim [Kalman]'s golden boy and have been there forever, but they could have a lot of statements written and it would go above Tim's head to home office.' (this part I don't believe)." (Id. )
Adler responded, "Well first I know the first part isn't true I never said that to anyone. Second, I need more information. Who are the 3 people that told you this and when?" (Id. ). She further stated, "Also Jared if they are telling the truth you need all of them to write statements tonight" and "We will look into this Monday. Can you get the statements tonight? Write yours as well about what you were told by who so that we have that as well and put in my top drawer in my desk." (Id. ).
Plaintiff apparently obtained either oral or written statements from various AMC employees, although it is not clear from the record from which employees he collected statements or whether those statements are included in the record.
E. AMC's investigations and Plaintiff's termination
The week of April 20, 2015, AMC began investigating the April 17th altercations with Branham and Williams as well as Plaintiff's allegations of the plot to get him fired. The investigations were conducted by Mary Melton-Miller, a Compliance Manager in AMC's home office in Kansas. (Doc. 32-4, Melton-Miller Dep. at 13). Melton-Miller conducted her investigation primarily by reviewing statements by various AMC employees that were collected by Easton General Manager Tim Kalman and Easton Senior Manager Stephanie McClelland. (Doc. 36, Kalman Dep. at 59-62).[1] Ultimately, Melton-Miller recommended that AMC terminate Plaintiff's employment for both (1) unprofessional behavior and (2) impeding an investigation. (Doc. 32-4, May 5, 2015 Email from Melton-Miller, PAGEID # 795). Melton-Miller forwarded her findings to Keana Bradley, AMC's Manager of Performance Management. (Id. ). Bradley reviewed Melton-Miller's findings, reviewed Plaintiff's performance reviews, and conferred with Kalman and Director of Operations Ryan Guichet. (Doc. 32-3, Bradley Dep. at 24-31). Based on this review, Bradley decided to terminate Plaintiff's employment. (Id. ).
Plaintiff's termination was effective May 8, 2015. Plaintiff commenced this action on December 9, 2015, seeking compensatory damages, back pay, and front pay under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311, and Ohio's statute prohibiting *884 employment discrimination on the basis of, inter alia , military service, Ohio Revised Code § 4112.02. Plaintiff bases his claims under both statutes on his termination in 2015 as well as AMC's passing him over for promotion in 2008. (Doc. 2, Am. Compl. ¶¶ 50-57).
II. SUMMARY JUDGMENT STANDARD
AMC moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Berryman v. SuperValu Holdings, Inc. , 669 F.3d 714, 716-17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. Id. at 249-50, 106 S.Ct. 2505.
The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56 ). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e) ; see also Cox v. Kentucky Dep't of Transp. , 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").
In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." Barrett v. Whirlpool Corp. , 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. Johnson v. Washington Cty. Career Ctr. , 982 F.Supp.2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Copeland v. Machulis , 57 F.3d 476, 479 (6th Cir. 1995) ; see also Anderson, 477 U.S. at 251, 106 S.Ct. 2505.
III. DISCUSSION
AMC has moved for summary judgment on all four of Plaintiff's claims: (1) wrongful termination in violation of USERRA, (2) failure to promote in violation of USERRA, (3) wrongful termination in violation of Ohio Revised Code § 4112.02, and (4) failure to promote in violation of Ohio Revised Code § 4112.02. The Court will discuss each claim in turn.
A. USERRA termination claim
USERRA was enacted to prohibit discrimination against individuals because of their military service.
*885 Bobo v. United Parcel Serv., Inc. , 665 F.3d 741, 754 (6th Cir. 2012) ; Hance v. Norfolk S. Ry. Co. , 571 F.3d 511, 517 (6th Cir. 2009) (per curiam). USERRA provides, among other things, that "[a] person who is a member of ... a uniformed service shall not be denied ... retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, ... performance of service, ... or obligation." 38 U.S.C. § 4311(a). An employer violates USERRA if an employee's military service is "a motivating factor" in taking the adverse action, "unless the employer can prove that the action would have been taken in the absence" of the employee's military service. 38 U.S.C. § 4311(c)(1).
In accordance with this statutory language, the plaintiff bears the initial burden of making a prima facie case that his military service was a motivating factor for the employer's action. Hance , 571 F.3d at 518. "Military status is a motivating factor if the defendant relied on, took into account, considered or conditioned its decision on that consideration." Petty v. Metro. Gov't. of Nashville-Davidson Cnty. , 538 F.3d 431, 446 (6th Cir. 2008) (quoting Coffman v. Chugach Support Servs. , 411 F.3d 1231, 1238 (11th Cir. 2005) ). Plaintiffs may meet their initial burden of showing military service was a motiving factor in the employer's action through direct or circumstantial evidence. Hance , 571 F.3d at 518. The Sixth Circuit has described relevant circumstantial evidence as including:
proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
Id. (quoting Sheehan v. Dept. of Navy , 240 F.3d 1009, 1013 (Fed. Cir. 2001) ).
If the plaintiff discharges his initial burden, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." Id. (quoting Sheehan , 240 F.3d at 1013 ).
1. Plaintiff's prima facie case
a. Direct evidence
Plaintiff alleges that Adler's history of negative comments directed toward his military time commitments constitutes direct evidence that his military status was a motivating factor in his termination. (Doc. 33, Pl.'s Mem. in Opp. at 21-22). However, although Adler was Plaintiff's direct supervisor, she had no authority to hire or fire employees at Plaintiff's level. (Doc. 34, Adler Dep. at 52-53). Indeed, she had no part in making the final decision to terminate Plaintiff or the preceding investigations, which were made by Bradley and Melton-Miller, respectively. (Doc. 32-3, Bradley Dep. 24-31; Doc. 32-4, Melton-Miller Dep. at 13).
Yet the Supreme Court has recognized that even where an employee expressing antimilitary animus is not the ultimate decision maker, an employer may nevertheless be liable under a "cat's paw" theory. Staub v. Proctor Hosp. , 562 U.S. 411, 422, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). In Staub , the Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." Id.
In order to attribute anti-military animus to AMC, Plaintiff must therefore *886 demonstrate that Adler took an action that (1) was intended to result in Plaintiff's termination, and (2) was in fact a proximate cause of his termination. Plaintiff asserts that Adler took such an action when she directed him to obtain statements from the three employees who told him of the alleged plot to have him fired, and when Melton-Miller and Bradley subsequently determined that his collection of those statements was cause for termination on grounds of "impeding an investigation." (Doc. 33, Pl.'s Mem. in Opp. at 21-22).
There is a considerable lack of clarity in the record as to as to exactly how Melton-Miller arrived at her conclusion that Plaintiff impeded an investigation. At her deposition, Melton-Miller testified that her termination recommendation rested on the twin bases of "unprofessional behavior" related to the April 17, 2015 altercations with kitchen staff, and "impeding an investigation." (Doc. 33-1, Melton-Miller Dep. at 60-61). But she was unable to articulate exactly how Plaintiff had interfered with any investigation by AMC. The "impeding an investigation" finding appears to rest on Plaintiff's collection of statements from AMC employees in relation to the alleged plot to have Plaintiff fired; Melton-Miller testified that Plaintiff should not have been the one to collect those statements because AMC's investigation into the alleged plot involved Plaintiff himself. (Id. at 63). When asked what Plaintiff should have done differently, Melton-Miller responded that Plaintiff should have "stayed out of it." (Id. at 75). But she was unable to explain how Plaintiff could have "stayed out of it" while still following a direct instruction by his supervisor:
Q: Jackie Adler instructed Jared to obtain his statements regarding the conspiracy plot. Are you saying that Jared should not have obtained those statements?
A: While-no, he should not have.
Q: Okay.
A: He-He should not have-anyone who brings an allegation, they should not be doing their-doing an investigation for their allegations.
Q: I don't know what you mean by that. He was instructed to. He was instructed to get statements by his supervisor, right?
A: According to that e-mail chain.
Q: Right. So is it your position that he should have disregarded his supervisor?
A: No.
Q: Is it your position that he should not have obtained the statements?
A: Yes.
(Doc. 31-1, Melton-Miller Dep. at 75-76). Plaintiff has therefore offered sufficient evidence that Adler's action in directing him to obtain statements relating to the conspiracy plot was a proximate cause of his termination.
However, Plaintiff has not offered any evidence that Adler issued this direction with the intention of causing Plaintiff's termination. In fact, Plaintiff himself stated at the time that he did not believe Adler was involved in any plot to get him fired. (Doc. 33-8, April 19, 2015 Text Messages). Adler, for her part, stated she continued to respond to Plaintiff's texts regarding the alleged plot "because he seemed concerned and I didn't want him to feel that we didn't care. I wanted him to know that we would look into it and he needed not to worry." (Doc. 32-2, April 28, 2015 Email from Jacqueline Adler, PAGEID # 768). While Adler allegedly made several negative comments over the years regarding Plaintiff's military time commitments, they did not cause Plaintiff to feel *887 that Adler would try to have him fired as of April 19, 2015, and Plaintiff has offered no explanation of why his view changed between that time and the filing of his lawsuit.
Plaintiff therefore cannot establish direct evidence via a "cat's paw" theory that his military service was a motiving factor in AMC's decision to terminate his employment.
b. Circumstantial evidence
Plaintiff has not offered any direct evidence of discrimination on the basis of his military activity. However, Plaintiff may also satisfy this burden with circumstantial evidence as outlined by the Sixth Circuit in Hance .
i. Proximity in time between the employee's military activity and the adverse employment action
Plaintiff makes much of the timing between his early April 2015 conversation with Adler, in which Adler allegedly threatened to terminate Plaintiff's employment if he failed to report to work the weekend of "The Avengers" movie release, and his termination approximately one month later. (Doc. 33, Pl.'s Mem. in Opp. At 19-20). However, the timing of these two events must be considered within the context of Plaintiff's 11-year employment with AMC, during which Plaintiff regularly requested and received weekends off once per month for military drills over a seven-year period (not to mention the six months' leave for basic and advanced individual training in 2008, and the one-year deployment to Afghanistan in 2011-12). Indeed, he had requested and already been approved for the time off during "The Avengers" weekend at the time of the conversation with Adler. (Doc. 36, Kalman Dep. at 77-78).
In a vacuum, a one-month period between an employee's USERRA-protected activity and an employer's adverse action may be close enough to satisfy the "proximity in time" facet of circumstantial evidence. Bobo , 665 F.3d at 756 (finding sufficient "less than two months" between USERRA-protected activity and termination); Savage v. Fed. Express Corp. , 856 F.3d 440, 449 (6th Cir. 2017), reh'g denied (July 26, 2017) (finding sufficient 41 days between USERRA-protected activity and termination). After taking into consideration Plaintiff's extensive history of requesting and receiving time off during his career at AMC, the Court finds the proximity of these two events insufficient to raise an inference that his military status was a motivating factor in AMC's termination decision.
ii. Inconsistencies between the proffered reason and other actions of the employer
AMC offered two reasons for Plaintiff's termination: (1) unprofessional behavior, and (2) impeding an investigation. (Doc. 32-4, May 5, 2015 Email from Melton-Miller, PAGEID # 795). The first reason is entirely consistent with Plaintiff's altercations with kitchen staff on April 17, 2015. Plaintiff does not dispute the essential facts regarding those altercations and does not argue that AMC could not have terminated his employment on this basis alone. Plaintiff has therefore not offered any evidence to demonstrate an inconsistency between AMC's actions and its proffered reason of unprofessional behavior.
The second reason, however, is problematic. As discussed above, Melton-Miller determined Plaintiff impeded an investigation because Plaintiff collected statements from other employees regarding the alleged plot to have him fired. (Doc. 31-1, Melton-Miller Dep. at 75-76). But it is undisputed that Plaintiff was acting under the instruction of Adler, his direct supervisor, when he collected those statements.
*888 (Doc. 33-8, April 19 2015 Text Messages). This is a clear inconsistency between AMC's actions and its proffered reason for terminating Plaintiff.
iii. Employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity
The only AMC employee alleged to have expressed hostility towards Plaintiff's (or anyone's) military service is Adler, who made a number of comments over the years regarding her frustration with Plaintiff's need for time off as it pertained to her scheduling responsibilities. (Doc. 29-1, Hickle Dep. at 328, 338-40). As already established, Plaintiff cannot impute Adler's anti-military animus to the decision makers who investigated and terminated Plaintiff's employment. Moreover, in the face of AMC's consistent accommodation of Plaintiff's time off requests over a seven-year period, these stray comments lack a sufficient nexus to Plaintiff's termination to raise an inference that Plaintiff's military status was a motivating factor in that decision. See Rademacher v. HBE Corp. , 645 F.3d 1005, 1011 (8th Cir. 2011) (employer's initial frustration with military obligations insufficient where time off requests were honored without incident over a three-year period); Starr v. QuikTrip Corp. , 655 Fed.Appx. 642, 646 (10th Cir. 2016) (even if insensitive remarks demonstrated anti-military animus, they were isolated and unrelated to the plaintiff's termination).
iv. Disparate treatment of certain employees compared to other employees with similar work records or offenses
Plaintiff has not put forth any arguments or evidence regarding disparate treatment of similarly-situated employees. The two other employees involved in the April 17, 2015 kitchen altercations were also terminated. (Doc. 36, Dep. of Tim Kalman at 36). And Plaintiff has not identified any other employees who collected statements related to their own investigation. Therefore, no inference of Plaintiff's military status being a motivating factor in his termination decision arises based on disparate treatment.
In conclusion, Plaintiff has not offered any direct evidence in support of his claim that his termination was motivated by his military status. Of the four categories of circumstantial evidence recognized by the Sixth Circuit, Plaintiff has established only one: inconsistency between AMC's proffered reasons for Plaintiff's termination and AMC's actions. While no inconsistency exists with regard to Plaintiff's unprofessional behavior in the April 17, 2015 incidents, there is a glaring inconsistency with regard to Plaintiff's alleged impeding of the investigation into the plot to have him fired. Namely, Plaintiff was both directly instructed to collect statements from fellow employees and then terminated, at least in part, based on his collection of those statements. AMC has not submitted any explanation for this inconsistency and the Court can find none in the record.
Although it is a close question in this case, the Court finds that this inconsistency is sufficient to raise an inference that Plaintiff's military status was a motivating factor in AMC's decision to terminate his employment. Plaintiff has therefore set forth a prima facie case for his USERRA termination claim.
2. AMC's showing that it would have taken the adverse action absent Plaintiff's military service
Plaintiff's prima facie case essentially asserts that AMC's finding that Plaintiff "impeded an investigation" was merely a pretext for discriminating against him based on his military status. AMC can *889 still succeed on its summary judgment motion by demonstrating that it would have terminated Plaintiff even absent Plaintiff's military service. To do so, AMC must demonstrate that "legitimate reasons [for terminating Plaintiff], standing alone, would have induced [AMC] to take the same adverse action against him." Savage , 856 F.3d at 452, quoting Hance , 571 F.3d at 518.
In USERRA discrimination cases, the Sixth Circuit has adopted a "modified honest belief" rule which states that "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." Escher v. BWXT Y-12, LLC , 627 F.3d 1020, 1030 (6th Cir. 2010), quoting Wright v. Murray Guard, Inc. , 455 F.3d 702, 708 (6th Cir. 2006). "The investigation process does not need to be perfect, but the employer must make 'a reasonably informed and considered decision before taking an adverse employment action.' " Id. , quoting Smith v. Chrysler Corp. , 155 F.3d 799, 806-07 (6th Cir. 1998) ; Graham v. Best Buy Stores , 298 Fed.Appx. 487, 494 (6th Cir. 2008) (noting that the employer needs to show that it "made its decision to terminate [the employee] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation").
Leaving aside AMC's "impeding an investigation" justification for terminating Plaintiff's employment (which cannot on this record be characterized as "legitimate"), AMC also relies on Plaintiff's unprofessional behavior in engaging in heated verbal altercations with two other kitchen employees. Bradley and Melton-Miller made the decision to terminate Plaintiff's employment on this basis after reviewing numerous employee statements describing the altercations, reviewing Plaintiff's performance evaluations, and speaking with Plaintiff himself. In her investigation summary, Melton-Miller stated that "[i]t was alleged, substantiated, but Jared denied arguing, yelling and behaving in an unprofessional manner with two cooks (Dwight Williams and Quinton Branham) who were terminated for their inappropriate behavior with Jared," and "[i]t was substantiated that Jared has a history/pattern of yelling, arguing, and behaving in an unprofessional manner with kitchen staff." (Doc. 32-4, May 5, 2015 Email from Melton-Miller, PAGEID # 795).
Plaintiff has not disputed these findings in his opposition. According to Plaintiff's own deposition testimony, when he called Bradley to dispute his termination, he raised concerns only about the "impeding an investigation" basis, not the "unprofessional behavior" basis. (Doc. 29-1, Hickle Dep. at 355-356). Nor has he refuted the evidence in his performance evaluations that concerns with his unprofessional or discourteous treatment of other AMC employees had been raised numerous times over the years. (Doc. 32-1, PAGEID # 705, 707, 709, 712, 715).
AMC has established with uncontroverted evidence that Plaintiff's unprofessional behavior was grounds for his termination. AMC has also established with uncontroverted evidence that it reached this conclusion after an investigation by outside, unbiased compliance personnel who reviewed Plaintiff's performance reviews and numerous statements of other AMC employees. AMC has therefore carried its burden to establish that it made "a reasonably informed and considered decision before taking an adverse employment action." Escher , 627 F.3d at 1030. Accordingly, the Court GRANTS summary judgment in *890 AMC's favor on Plaintiff's USERRA termination claim.
B. USERRA failure to promote claim
In addition to his termination, Plaintiff also asserts that AMC violated USERRA when it failed to promote him to Hourly Manager in 2008. The same burden-shifting framework is applicable to this claim, such that Plaintiff must make a prima facie showing that his military status was a motivating factor in AMC's decision not to promote him, and then, if the prima facie case is established, AMC may rebut it with evidence that it would have failed to promote Plaintiff even absent his military status.
1. Plaintiff's prima facie case
Plaintiff alleges that AMC denied him a promotion after he informed Kalman that he would be off work for basic and advanced individual training for six months in 2008:
Q: Did you make any complaints about Tim to anybody at AMC?
A: Yes, ma'am.
Q: To whom?
A: To Devin Bolton, who is a senior manager. There was a manager position that was open shortly after I joined the National Guard, around the time that I joined the National Guard. He called me up to his office for an interview for an hourly manager position. During the time, he told me that I was the top candidate. I told him that I was ecstatic, as I really wanted the position; however, just to inform you, I would be missing from June until December for my basic training and my advanced individual training. He ended the interview at that time, told me that I could no longer be qualified for that position, and ended the interview. He did tell me that upon my return, he would help me get to where I want to be at AMC.
(Doc. 29-1, Hickle Dep. at 125-26). Kalman denies making these statements and denies that Plaintiff was ever under consideration for the promotion in 2008, as he felt at the time that Plaintiff needed more time to mature before being promoted. (Doc. 32-2, April 22, 2015 Statement of Tim Kalman, PAGEID # 756). AMC later promoted Plaintiff to Hourly Manager in 2009 after his return from initial military training and to Kitchen Manager in 2013 (Doc. 29-1, Hickle Dep. at 113, 116).
The Court again reviews Plaintiff's submissions for direct or circumstantial evidence that his military service was a motivating factor in AMC's decision not to promote him 2008. Circumstantial evidence can be shown by (i) proximity in time between the employee's military activity and the adverse employment action, (ii) inconsistencies between the proffered reason and other actions of the employer, (iii) an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and (iv) disparate treatment of certain employees compared to other employees with similar work records or offenses. Hance , 571 F.3d at 518.
At best, Plaintiff has offered circumstantial evidence based on proximity in time that AMC's failure to promote him in 2008 was motivated by his military status. Taking the disputed facts in the light most favorable to Plaintiff, Kalman denied him the promotion immediately after learning Plaintiff would be taking a six-month leave of absence for military training. Plaintiff has not demonstrated any direct evidence or any other circumstantial evidence based on inconsistency in AMC's actions, expressions *891 of anti-military animus, or disparate treatment of similarly-situated employees.
While this evidence is thin, the Court cannot say that Plaintiff has failed to show a triable issue of fact. When viewed in the light most favorable to the non-movant, as the Court must when considering summary judgment, Plaintiff's evidence could be sufficient for a jury to find that AMC denied Plaintiff the 2008 promotion based on his military leave of absence. Accordingly, Plaintiff has made out a prima facie case for his USERRA failure to promote claim.
2. AMC's showing that it would have taken the adverse action absent Plaintiff's military service
AMC attempts to rebut this prima facie case by asserting that AMC would not have promoted Plaintiff in March of 2008 even absent his military service-that is, Kalman asserted that Plaintiff was never under consideration for the 2008 promotion because at that time Kalman felt Plaintiff was insufficiently mature. (Doc. 32-2, April 22, 2015 Statement of Tim Kalman, PAGEID # 756). AMC also promoted Plaintiff to Hourly Manager in 2009 after he returned from his six-month military leave of absence. (Doc. 29-1, Hickle Dep. at 113, 116). AMC has not offered any other evidence to rebut Plaintiff's prima facie case, such as the qualifications or military status of the individual who was awarded the Hourly Manager position in 2008.
While Kalman disputes Plaintiff's version of events, AMC is entitled to summary judgment only if it refutes Plaintiff's prima facie case with undisputed facts. On this record, Plaintiff's qualifications for the 2008 promotion, and the reasons he did not receive it, come down to essentially "he said-he said" evidence that cannot be resolved at the summary judgment stage. Plaintiff has therefore demonstrated the existence of a genuine issue of material fact as to AMC's decision not to promote him in 2008. Accordingly, the Court DENIES summary judgment for AMC on Plaintiff's USERRA failure to promote claim.
C. Ohio statutory claims[2]
Ohio Revised Code § 4112.02 prohibits, among other things, employment discrimination on the basis of "race, color, religion, sex, military status, national origin, disability, age, or ancestry." Both parties assert that Plaintiff's claims for discrimination on the basis of military status under § 4112.02 are governed by the same burden-shifting framework employed with claims under USERRA. (Doc. 32, Def.'s Mem. in Supp. at 10 n.6; Doc. 33, Pl.'s Mem. in Opp. at 17 n.2). But the analytic framework for a § 4112.02 claim for employment discrimination on the basis of military status is apparently a matter of first impression. The Court was unable to locate any state or federal cases analyzing the elements or burdens of proof required by § 4112.02 in the context of military status.[3]
*892 However, courts interpreting § 4112.02 discrimination claims on bases other than military status have consistently adopted the framework of their federal counterparts. E.g. , Grosjean v. First Energy Corp. , 349 F.3d 332, 340 (6th Cir. 2003) (applying Age Discrimination in Employment Act standards to § 4112.02 claims for age discrimination); Laughlin v. City of Cleveland , 633 Fed.Appx. 312, 314 (6th Cir. 2015) (applying Title VII standards to § 4112.02 claims for race and sex discrimination); Daugherty v. Sajar Plastics, Inc. , 544 F.3d 696, 702 (6th Cir. 2008) (applying Americans with Disabilities Act standards to § 4112.02 claims for disability discrimination). Thus, in the absence of any Ohio authority to the contrary, the Court is satisfied with both parties' assertions that Ohio courts would apply the USERRA burden shifting framework to § 4112.02 claims for employment discrimination on the basis of military status.
Accordingly, the Court GRANTS summary judgment in favor of AMC, based on the above analysis under USERRA, on Plaintiff's state law termination claim.
Substantively, Plaintiff has made an unrebutted prima facie case for failure to promote under Ohio Revised Code § 4112.02 in addition to USERRA. But AMC correctly points out that actions brought under Ohio's anti-discrimination statute, unlike USERRA, are subject to a six-year statute of limitations.[4] R.C. § 4112.99 ; Cosgrove v. Williamsburg of Cincinnati Management Co., Inc. , 70 Ohio St.3d 281, 638 N.E.2d 991 (1994). Since Plaintiff's claim for failure to promote undisputedly accrued in 2008, and Plaintiff did not file suit until December 2015, this claim is time-barred. Accordingly, the Court GRANTS summary judgment in favor of AMC on Plaintiff's state law failure to promote claim.
IV. CONCLUSION
For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART AMC's Motion for Summary Judgment. Judgment for AMC is GRANTED on Plaintiff's USERRA claim for unlawful termination and on both Ohio statutory claims. Judgment for AMC is DENIED on Plaintiff's USERRA claim for failure to promote.
The Clerk shall remove Document 32 from the Court's pending motions list.
IT IS SO ORDERED.

Plaintiff asserts that Adler participated in collecting employee statements as part of the investigation; however, the portion of Kalman's deposition testimony that Plaintiff cites for this assertion in fact states that it was McClelland, and not Adler, who assisted in collecting statements. (Doc. 36, Kalman Dep. at 59-62).

AMC argues that Plaintiff abandoned his state law claims by failing to address them in his opposition. However, Plaintiff, just like AMC, included a footnote explaining that the state law claims are analyzed under the same framework as the USERRA claims. (Doc. 33, Pl.'s Mem. in Opp. at 17 n.2). Thus, Plaintiff did address his state law claims in his opposition and has not abandoned them.

The cases cited by the parties on this point either do not relate to discrimination on the basis of military status, or merely conclude in passing without analysis that the USERRA framework applies to § 4112.02 claims. See Kimble v Intermetro Indus. , 288 F.Supp.2d 876, 879 (N.D. Ohio 2003) ; Vaughn v. Titan Int'l Inc. , No. 3:13 CV 409, 2014 WL 6997517, at *7 (N.D. Ohio Dec. 5, 2014).

USERRA has no applicable limitations period. 38 U.S.C. § 4327(b) ("If any person seeks to file a complaint or claim with ... a Federal or State court under this chapter [38 USCS § 4301 et seq. ] alleging a violation of this chapter [38 USCS § 4301 et seq. ], there shall be no limit on the period for filing the complaint or claim.").